397 So.2d 1237 (1980)
STATE of Louisiana
v.
Renee MORRIS.
No. 64786.
Supreme Court of Louisiana.
March 3, 1980.
On Rehearing April 6, 1981.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., John Sinquefield, Asst. Dist. Atty., for plaintiff-appellee.
Alton T. Moran, Office of the Indigent Defender, Baton Rouge, for defendant-appellant.
SUMMERS, Chief Justice.[*]
Defendant Renee Morris was indicted by the East Baton Rouge Parish Grand Jury and charged with first degree murder in violation of La.Rev.Stat. 14:30. The indictment alleged that defendant committed the offense on August 17, 1977. At the time the offense was defined as follows:
"First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury." La. Rev.Stat. 14:30.
Defendant filed a motion for a bill of particulars, seeking to ascertain: "Which of the aggravating circumstances enumerated in Code Crim.Pro. 905.4 were allegedly performed by defendant in the alleged commission of the offense for which she is charged?"
In response to this inquiry, the State specified sections (c) and (g), which provide:
"(c) The offender was previously convicted of an unrelated murder, aggravated rape, or aggravated kidnapping;"
"(g) The offense was committed in an especially heinous, atrocious, or cruel manner."
Based upon this answer and an erroneous reading of this Court's opinion in State v. *1238 Payton, 361 So.2d 866 (La.1978), defendant filed a motion to quash. In her motion to quash, defendant asserted that the two sections of Article 905.4 of the Code of Criminal Procedure specified by the State "were not intended by the Legislature to be elements of the first degree murder definition." At the hearing on the motion to quash, the trial judge allowed the indictment to be amended to charge defendant with second degree murder. The State objected to this ruling, but defendant did not.
The second degree murder statute under which defendant was charged pursuant to the amended indictment provided at the time of the alleged offense:
"Second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill.
"Whoever commits the crime of second degree murder shall be imprisoned at hard labor for life and shall not be eligible for parole, probation, or suspension of sentence for a period of forty years." La.Rev.Stat. 30.1, As amended by Acts 1976, No. 657 § 2.
After the trial the jury returned a unanimous verdict of guilty on the charge of second degree murder. Defendant was sentenced to life imprisonment at hard labor without benefit of parole for twenty years. On appeal to this Court, defendant has made thirty-seven assignments of error, which have been consolidated into separate arguments in defendant's brief. They will be considered accordingly.
On the afternoon of August 17, 1977, defendant telephoned her husband, Dennis Morris, at the service station where he was employed and told him that something was wrong with their sixteen-month-old son, Michael Morris. At the trial the husband testified that when he arrived home he found the child lying in his crib. The child was semi-conscious; his eyes were rolling back in his head, his arms and legs were stiff, and blood was running from his mouth. With the assistance of a State Trooper, the child was transported to a hospital. Because of the severity of his head injuries, it was determined that he should be transferred to another hospital. The child was transferred by ambulance to another hospital where he was placed in the intensive care unit. He died a few hours later as a result of extensive head injuries.
Argument 1: Defendant contends that the trial judge erred when he refused to sequester prospective jurors awaiting call while voir dire examination was in progress.
Twenty-four people from the jury venire were initially present in the courtroom. This entire group was dismissed because of a response given by one of the prospective jurors. When this juror was asked whether she knew the defendant, she replied, "I worked with her when she did time before."
Before voir dire examination commenced with this first group of twenty-four, defense counsel made an objection to the entire group being brought into the courtroom at one time. This objection was overruled. After this group was dismissed, a group of twenty was brought into the courtroom. Twelve names were then called for voir dire. After these persons were examined, two jurors were sworn and the rest were excused. After further examination, three jurors were impaneled out of the remaining eight members of the panel. Another group was brought into the courtroom from which various smaller groups were called and examined. A couple of jurors were impaneled from some of these smaller groups or the group or its remainder was excused. This process was repeated until the twelve-member jury was complete.
The record does not contain a defense motion for sequestration of the prospective jurors during voir dire examination, but an objection was made when an entire panel was called into the courtroom at one time. The defense brief suggests that because of the nature of the crime for which the defendant was charged and the emotional reaction an individual might have to this particular crime, prospective jurors who were *1239 not being examined should have been shielded from the answers given by those being examined.
We find no merit in defendant's argument. Article 784 of the Code of Criminal Procedure provides in part: "In selecting a panel, names shall be drawn from the petit jury venire indiscriminately and by lot in open court and in a manner to be determined by the court." Comment (c) to this article provides that "[d]etails such as whether the jurors should be called singly or by groups of two, three, etc., are left to the court's discretion."
Special circumstances are needed before this Court will find an abuse of discretion in the trial court's denial of sequestration. State v. Dominick, 354 So.2d 1316 (La.1978); State v. Hegwood, 345 So.2d 1179 (La.1977); State v. Groves, 311 So.2d 230 (La.1975); State v. Robinson, 302 So.2d 270 (La.1974). Defendant has not pointed to a specific answer given or to a specific question asked on voir dire examination that might have prejudiced the view of other prospective jurors. In the absence of such a showing, this assignment lacks merit.
Defendant does give as an example the instance in which one prospective juror mentioned that she knew the defendant from working with her when she "did time before." However, as we discussed earlier, when this response was made, the trial court properly dismissed the entire panel of twenty-four persons exposed to this reply. Any prejudice resulting from this remark by one of the prospective jurors was cured by the dismissal of anyone who might have heard the statement. The possibility of such an answer or a similar response being elicited at a later time was very remote. This one example, which did not result in prejudice to the accused, does not support defendant's argument. Without proof of something more specific which caused actual prejudice, defendant's assertion of error lacks merit.
Defendant additionally asserts that sequestration would have prevented prospective jurors who wished to avoid jury duty from "seizing on those answers which resulted in the excusing of another prospective juror for cause." Defendant claims that a number of prospective jurors were excused for the same or similar reasons. Jurors were excused, the defense points out, because of possible problems caused by their feelings about the severity of the penalty, the viewing of photographs of the dead child, and the effect of facts concerning child abuse on their objectivity. It is conceded, however, that it is not certain that these prospective jurors used the answers of earlier jurors to avoid service on the jury. Sequestration, defendant claims, would have avoided any doubt.
These arguments ignore the fact that prospective jurors must take an oath before voir dire examination begins. Article 786 of the Code of Criminal Procedure provides that "[a] prospective juror, before being examined, shall be sworn to answer truthfully questions asked him relative to his qualifications to serve as a juror in the case." This provision furthers the purpose which a properly conducted voir dire examination should guarantee, that is, to determine the ability of each juror to render an impartial verdict. State v. Williams, 310 So.2d 528 (La.1975). To hold otherwise would be to find that each juror who was excused for cause here violated the oath which each was required to take prior to examination.
These assignments are without merit.
Argument 2: Defendant asserts that the trial court erred in allowing the State to testify about unproven facts during voir dire examination. This contention concerns comments made by the district attorney during voir dire examination concerning circumstantial evidence as distinguished from eyewitness testimony. One particular excerpt to which the defendant objected reads as follows:
"Q. This is a case of mixed evidence anduhthe definition of circumstantial evidence is almostuhlike the definition of reasonable doubt. You know, who is to say what's direct evidence, what's circumstantial evidenceuhin a case. The law providesuhof course, you can *1240 be convicted on circumstantial evidence if you couldn't, probably, I, I couldn't venture a percentage, but I'd probably say that at least fifty percent of the crime committed, there's not eye witnesses to it."
Following this comment defense counsel objected that the prosecutor was testifying to certain facts which were not on the record. The objection was overruled.
The prosecutor subsequently remarked:
"Q. Okay. I might tell you that that's particularly applicable in homicide, `cause in a great percentage of homicides, there's only two people present and one of `em winds up dead. So, if you couldn't use the circumstances to convict somebodyuhyou couldn't ever convict `em. It would be, you'd be, talk about a way to commit crime and get away with it, just make sure there's no eye witnesses and do it. Then, you come into court and say, you know, circumstantial evidence, you can't convict me. UhI think all of us agree that the law would be in a sorry state if that in fact was the law and uhit would be time to by (sic) some extra locks for your doors or whatever you do to protect yourself for crime."
Again defense counsel objected, stating that the prosecutor was trying "to inflame the jury to convict." This objection was also overruled. A later objection to a similar statement regarding the percentage of circumstantial evidence cases was overruled. In closing argument, the State again referred to these comments over defense objection.
The purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competency and ability to render an impartial verdict. As voir dire is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges, its scope is within the sound discretion of the trial judge and his rulings will not be disturbed unless he clearly abused this discretion. State v. Murray, 375 So.2d 80 (La.1979); State v. Williams, supra; State v. Jackson, 358 So.2d 1263 (La.1978). To determine whether the judge abused his discretion, a review should be undertaken of the voir dire examination as a whole. State v. Jackson, supra; State v. Ford, 349 So.2d 300 (La.1977).
In conducting this review, the comments of the prosecutor should not be taken out of context. For instance, prior to the second comment of the prosecutor, quoted supra, to which defense counsel objected, the prosecutor asked the same prospective juror: "Q: Uhcould you convict somebody on circumstantial evidence, if that evidence convinced you beyond a reasonable doubt that they committed a crime? A: Yes." Such counterbalancing remarks by the prosecutor, when examined with statements made by the judge to the jury, offset the expressions of personal opinion made by the prosecutor. The prosecutor later told the jury that the percentages to which he referred were just an estimate. Furthermore, the judge gave the jury several examples of situations involving circumstantial evidence. When viewed in its entirety, the voir dire examination properly explored any possible prejudices the prospective jurors might have had regarding circumstantial evidence, but did not mislead them about its proper definition.
Argument 3: Allowing a challenge for cause by the State is the subject of this assignment of error.
Both the State and the defense exhausted all peremptory challenges prior to the end of the jury selection process. Since the State had exhausted its peremptory challenges and the ruling by the trial court would have allowed more peremptory challenges than it was entitled to by law, this ruling is properly before this Court for review. State v. Vinet, 352 So.2d 684 (La. 1977).
The prospective juror who was excused for cause, Mr. Rucker, expressed concern as to whether drugs were involved in the case. When asked whether he could return a verdict of guilty as charged if the State could prove its case, the juror responded, "I imagine I could ... I would need to know under what conditions this was done." Mr. Rucker *1241 explained further that since "dope is so prevelent (sic)," he was concerned, because "[i]t would be terrible to take thirty years out of a persons (sic) life unless you know that." The judge explained to the prospective juror that drugs would not be at issue in the case unless intoxication or other condition of the defendant was offered as a defense. When the judge finished explaining that the juror need not be concerned with the use of drugs or intoxication unless such was brought out in the evidence as a defense, the judge asked the juror whether he could concern himself only with the evidence presented at trial, to which the juror replied, "I think so."
The juror next responded to a question from the prosecutor that he could not convict a person on circumstantial evidence and he would hold the State to a higher burden of proof. At this point, the State challenged for cause. The judge attempted to rehabilitate the juror by explaining the difference between direct evidence and circumstantial evidence and the validity of both types of evidence. He also explained the burden of proof the State must discharge. When the juror again expressed his concern about whether the crime "was done under the influence of something else," the judge again explained that such considerations would be brought up by the defense if these were part of the evidence.
Finally, the trial judge asked the juror whether he could base his decision upon the evidence presented in the case in determining the guilt or innocence of the accused. The juror replied that he could. Then the trial judge denied the State's challenge for cause.
The prosecutor called the name of the next juror to be examined and asked her whether she could return a verdict of guilty that would mandate the judge to impose the sentence imposed by the statute, that of life imprisonment without possibility of parole or probation for twenty years. Mr. Rucker, the previous person questioned, responded, "I guess I could." The trial judge then allowed the State to question Mr. Rucker as to whether he would hold the State to a higher burden of proof. The juror replied that he "would really have to have proof." When the judge ascertained that the juror would require a higher degree of proof from the State because of the nature of the crime, the juror was excused. Defendant objected, claiming that the challenge for cause did not meet the requirements of Article 797 of the Code.
Either the State of the defendant may challenge a juror for cause when the juror will not accept the law as given by the court. La.Code Crim.Pro. art. 797(4). In State v. Vinet, 352 So.2d 684 (La.1977), in which a prospective juror insisted upon her belief that proof of guilt should be "to a certainty," this Court held that the trial judge was correct in excusing the juror. At the same time this Court recognized the proper standard of proof in a criminal case as proof beyond a reasonable doubt and held that a juror's inability to accept the law was a valid ground for a challenge for cause. Id., 352 So.2d at 686.
Even after repeated attempts by the trial judge to rehabilitate the prospective juror in this case, the juror clearly expressed his feeling that he would hold the State to a higher burden of proof. Because this juror's interrogation demonstrated that it would be very difficult, if not impossible, for him to apply the law, the trial judge properly excused him for cause.
This assignment is without merit.
Argument 4: The trial judge's instruction to a prospective juror on the presumption of innocence accorded defendant is claimed as error here.
During voir dire one of the jurors expressed concern with the concept of the presumption of innocence as related to the grand jury indictment. In an attempt to clarify the matter, the trial judge said:
"And you must be convinced, in order to bring in a verdict of guilty, you must be convinced by competent, sworn testimony and other evidence offered by either side of the guilt of the defendant. If you are not so convinced, you should find her not guilty in spite of anything else that you *1242 may believe about Grand Juries and so forth. You must base your verdict on the testimony from the witnesses and any physical evidence offered. Do you think you can do that?"
Defense counsel entered an objection to this instruction "for the record," and although the grounds for the objection were not specified defendant now asserts that the trial judge erred in omitting an instruction regarding the presumption of innocence, in that he failed to state that the defendant must be given the benefit of every doubt arising out of the lack of evidence as well as the evidence presented in the case.
Voir dire examination must be viewed in its entirety in order to determine whether the judge erred in defining the scope of voir dire. This juror was seated in the courtroom when the State's burden of proof had been explained several times. In addition, just prior to the instruction from which defendant complains, defense counsel asked this particular juror and another woman:
"Q. You have been here all morning and you've heard all of my questions two or three times and I'm sure that you are thoroughly confused about everything that I've asked. But the things that I've been stressing most are presumption of innocence. That Renee Morris sits here with a presumption of innocence. The State has to prove their case beyond any reasonable doubt, each and every element of it. Can you both accept that?"
Both women responded in the affirmative, with the one juror in question continuing to express her concern with the conflict between this concept and the grand jury indictment. The fact that she recognized such a conflict shows that she understood the presumption of innocence as explained by defense counsel and she was concerned about how it might be altered by the idea of a grand jury indictment. The trial judge's comments were designed to remedy this problem in the juror's mind in an effort to rehabilitate her.
After the challenged remark, defense counsel asked this juror:
"Q: Ms. Hall, what about you? Can you give me and my client a fair trial in this case?
A: Yes.
Q: Neither, neither one of you will convict just on suspicion alone? You will require the State to prove their case ....
A: (Hall) Yes.
Q: Beyond any reasonable doubt and excluding any other reasonable hypothesis of innocence?
A: (Hall) Yes."
Ms. Hall was also asked by defense counsel:
"Q: Now, the rule as to circumstantial evidence in this state is that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. Can you accept that, Ms. Hall?
A: Yes."
When taken as a whole, the questions and answers of this particular juror show that this juror received the proper instruction regarding the State's burden of proof. Especially when it is remembered that this juror was present throughout the voir dire examination and heard instructions regarding the proper burden of proof and the presumption of innocence, the comment can be seen as properly within the trial judge's discretion.
This assignment is without merit.
Argument 5: The defense asserts that the State failed to introduce any evidence of the essential elements of second degree murder under the statutory definition applicable at the time of the alleged offense.
As noted the indictment, which originally charged defendant with first degree murder, was amended to charge second degree murder, pursuant to a motion to quash filed by defendant. At the time of the offense, the quoted second degree murder statute was known as the "felony murder" statute. Shortly after the date of the alleged offense, this statute was amended to read:
"§ 30.1 Second degree murder
Second degree murder is:

*1243 A. The killing of a human being when the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill; or
B. The killing of a human being when the offender has a specific intent to kill, under circumstances that would be first degree murder under Article 30, but the killing is accomplished without any of the aggravating circumstances listed in Article 905.4 of the Louisiana Code of Criminal Procedure.
Whoever commits the crime of second degree murder shall be imprisoned at hard labor for life and shall not be eligible for parole, probation, or suspension of sentence for a period of forty years." As amended by Acts 1977, No. 121, § 1.
This amendment was enacted by the Legislature about the time of the alleged offense; however, its effective date was September 9, 1977, almost a month after the offense alleged in the indictment.
Defendant based her motion to quash upon the bill of particulars filed in response to her request and upon an incorrect application of this Court's opinion in State v. Payton, 361 So.2d 866 (La.1978). In Payton this Court considered the constitutionality of the first and second degree murder statutes after the 1977 amendment to the scheme, quoted above, included within the definition of second degree murder killings with specific intent which were performed without any of the aggravating circumstances provided in Article 905.4. This Court interpreted the effect of the amendment as implicitly amending the first degree murder statute to include specific intent killings accomplished in a manner designated by the Legislature to constitute aggravating circumstances.
Defendant based the main thrust of her motion to quash upon two other aspects of this Court's holding in Payton. First, this Court held that aggravating circumstances not related to the commission of the crime for which the defendant was on trial, i. e., that the defendant was previously convicted of an unrelated murder, aggravated rape or aggravated kidnapping, La.Code Crim.Pro. art. 905.4(c), was not intended by the Legislature to be included within the first degree murder definition. Second, this Court concluded that evidence of two other aggravating circumstances was not admissible at the merit trial. One of these aggravating circumstances, that provided in La.Code Crim. Pro. art. 905.4(g), that the offense was committed in an especially heinous, atrocious, or cruel manner, was one of the aggravating circumstances specified by the State in its bill of particulars. Unfortunately, this Court's holding in Payton was not applicable to the 1976 legislation that was in effect at the time of the alleged offense, but referred to the 1977 amendment to the second degree murder statute and its effect on the first degree murder statute after the effective date of the amendment.
At the hearing on the motion to quash, the State argued correctly that the 1977 amendment to the second degree murder statute did not apply at the time of the alleged offense. Defense counsel did not argue the motion, but rather said, "The motion speaks for itself. The case speaks for itself." The trial judge stated that the defendant should get the benefit of this Court's holding in Payton and amended the indictment to charge defendant with second degree murder. The indictment was amended over the State's objection; the defendant did not object to the amendment.
Defendant now wishes to argue that the indictment was erroneously amended, even though the amendment was made pursuant to defense counsel's convoluted application of Payton to the wrong statute. Defendant failed to object when the indictment was amended, which would have been the proper time to raise this issue.
At the close of the State's case, defendant made a motion for a directed verdict on the second degree murder charge, claiming that no evidence had been introduced to prove the elements of felony murder as required by La.Rev.Stat. 30.1 before the 1977 amendment.
*1244 A motion for a directed verdict in a jury trial is not authorized since the 1975 amendment to Article 778 of the Code of Criminal Procedure. As amended the article provides only for a motion for a judgment of acquittal in a bench trial. The motion for a directed verdict was properly denied.
Although defendant assigns error to the trial court's ruling on the motion for directed verdict, defense counsel did not urge the lack of evidence argument in the motion for a new trial which was filed later. Defendant asserted that the verdict was "contrary to the law and the facts," but only in that certain expert testimony was admitted. The pertinent portion of the motion for a new trial alleged:
"A. The verdict was contrary to the law and the evidence in that various members of the medical profession were qualified as "experts" in the area of child abuse and were allowed to testify regarding whether or not they thought this was a child abuse case when:
1. The witnesses had no special knowledge in this area.
2. The witnesses were allowed to give opinions on ultimate facts which should have been reserved to the jury alone to determine.
3. These witnesses were qualified as "experts" in the area of child abuse without discussing an important part of their determination, i. e. the history of this accident as given to them by the mother.
Consequently, the jury received testimony that this was a case of child abuse when the actual medical evidence could not rule out the possibility of the death resulting from an accident."
In order to properly preserve for appellate review whether evidence of an essential element of the crime was presented in a jury trial this issue must be raised in a motion for a new trial. State v. Blackstone, 347 So.2d 193 (La.1977). This was not done. This assignment is therefore without merit.
Argument 6: Defendant assigns as error the trial court's admission of evidence of prior offenses of the defendant introduced by the State without a Prieur notice.
Before his opening statement and out of the hearing of the jury, the prosecutor indicated to the trial court his intent to introduce evidence of defendant's treatment of the child, Michael Morris, during the period preceding the child's death. The stated purpose of the evidence was to show that the child had been a victim of abuse and that the injuries causing his death resulted from actions of defendant. The prosecutor indicated that the State intended to show that defendant "spanked the child too hard, that she corrected it too hard." The prosecution noted that it would prove that defendant would occasionally shake the child and "put bruises about its body."
The State asked the trial judge for a preliminary ruling on the admissibility of such evidence. After lengthy oral argument, the trial court ruled that evidence of prior abuse of the deceased child by the defendant was admissible. To this ruling defense counsel objected on the ground that no Prieur notice was given.
Prior to trial the State had indeed filed a "768 Notice to Defendant," enumerating the various statements made by defendant which the State intended to introduce as evidence. After the trial court's ruling on the admissibility of some of this enumerated evidence, several witnesses, six in all, testified that they had seen bruises on the child's body prior to the date of his death.
The State's first witness, defendant's husband, testified that his wife was sometimes "too rough on the child," that she "spanked the child quite hard" and often "shook the child too hard."
Another witness, Leola Ruth Koppe, a neighbor, testified that a few days prior to August 17, 1977, she observed that the child had black bruises on his face.
Mary Lou Pranter and her daughter, Lauren, who baby-sat for the child, both testified that the child had bruises on his face. When the daughter was asked to describe the bruises, she stated that "they looked like finger marks." She also testified *1245 that the child had a large bump on his forehead. Both Mrs. Koppe and Mrs. Pranter testified that defendant explained the bruises by stating that the child "fell a lot," or that he "fell and hit a piece of furniture."
Another neighbor, Susan Green Altazin, testified that she observed bruises on the child's face, back, chest, and legs. She also testified that in late July, she saw defendant slap the child very hard when he cried after being "ducked" in the deep end of a neighborhood swimming pool.
Finally, Vickie McCarter, an acquaintance of the defendant through volunteer work at the Red Cross, described bruises she had seen on the child's face and legs. Although she testified that she never saw defendant spank or strike the child, she did recall one occasion when defendant "became upset" at the child while visiting the zoo.
Defendant's argument that sufficient notice was not given of the State's intention to introduce this evidence under this Court's guidelines in State v. Prieur, 277 So.2d 1261 (La.1973), is not well-founded. The State filed a "768 Notice" listing the names of each of the six witnesses whose testimony is described in the preceding paragraphs. Defendant can hardly complain that she was surprised or unduly prejudiced by their testimony in light of the filing of the notice. State v. McDaniel, 336 So.2d 841 (La.1976).
As this Court has held previously, evidence showing the relationship between the victim and the defendant is admissible. State v. Watson, 301 So.2d 653 (La.1974); State v. Burkhalter, 211 La. 342, 30 So.2d 112 (1947); State v. Cordier, 297 So.2d 181 (La.1974); State v. Thibeaux, 366 So.2d 1314 (La.1978). In Watson the defendant objected to the introduction of evidence that the defendant and the murder victim had quarrelled and fought approximately nine months before the murder. This Court held that this evidence was properly admitted. Id., 301 So.2d at 656. Cordier held that in a prosecution for the charge of aggravated crime against nature, testimony regarding a stab wound inflicted during a prior attack by the defendant upon the victim was admissible "to show one of the necessary elements of the crime." 297 So.2d at 184.
In proving that defendant had inflicted the head injuries that caused the child's death by a subdural hematoma, evidence concerning defendant's treatment of the child on prior occasions was certainly relevant to prove a material fact at issue in the case. La.Rev.Stat. 15:435. However, defendant did not object to the introduction of this evidence on the grounds of relevance. The sole basis for the objection was the lack of sufficient Prieur notice, which, as discussed above, lacks merit.
These assignments are without merit.
Argument 7: Defendant contends that the trial court erred in unduly limiting defense counsel's cross-examination of state witnesses.
On direct examination defendant's husband testified that defendant was too rough on the child and that he had tried unsuccessfully to protect the child by taking him away from defendant. On cross-examination, defense counsel questioned Mr. Morris about his relationship with his daughter. When counsel attempted to ask the witness a similar question relating to whether he had recently seen or supported his son, who was living with defendant's parents, the State objected. The State asserted that defense counsel was in violation of this Court's order in State v. Morris, 362 So.2d 1379 (La.1978).
In State v. Morris, this Court held that the State could not introduce as part of its case-in-chief evidence of previous offenses committed by the defendant. This evidence related to two prior charges to which this defendant had pled guilty. Six years before the current offense defendant had entered a guilty plea to a charge of aggravated assault upon her then six-month-old son. This son was the child referred to in defense counsel's question. Three years before the current offense defendant had pled guilty to a charge of manslaughter in the death of another son, who was three *1246 months old and died shortly after being beaten. This Court held that since the prejudicial effect of this evidence "far outweigh[ed] whatever probative value it might have," the evidence was inadmissible. Id., 362 So.2d at 1382.
This Court did note, however, in a footnote to the Morris opinion, that:
"[d]ifferent consideration[s] may obtain if the accused affirmatively raises specific issues of fact which the otherwise-inadmissible other-crime evidence becomes relevant to rebut...." Id., 362 So.2d at 1381.
By this language the Court made reference to possible defenses such as accident or normal parental discipline as causes of the child's injuries.
The Court sustained the State's objection to this question about the son upon which defendant had committed the aggravated assault for which she was charged. The objection was sustained on the ground that the question was not relevant. Defense counsel next asked Mr. Morris: "Q: Okay, Dennis, did Mr. Sinquefield (the prosecutor) tell you to eliminate some of what was said and what happened when you came back to that apartment?" The State objected to this question and the jury was retired.
Out of the presence of the jury, counsel and the judge discussed the applicability of the Morris order. The State had instructed the witness not to volunteer any information about the defendant's explanation to her husband that the child had fallen from his high chair, as the State believed that this would open the door to an accident defense, thus allowing the other-crimes evidence to be introduced. Not wishing to contravene the ruling of this court in Morris, the State interpreted the ruling as mandating an avoidance of any accident defense. When defense counsel attempted to elicit this information from Mr. Morris on cross-examination, the State feared that a mistrial would result if a self-serving declaration of defendant was revealed.
The judge instructed defense counsel that his questions were not to make it appear that the prosecutor was hiding anything from the jury. The Court informed defense counsel that he could ask questions and after answers were given a determination would be made as to whether these constituted an affirmative defense. Defendant argues that the trial judge unduly limited cross-examination by his ruling on the objection, but it does not appear that the Court instructed counsel that he could not ask the witness what defendant said about the cause of the injuries.
These alleged errors seem harmless when it is remembered that much testimony was given regarding defendant's explanations about the child's bruises. The objection made by the State and the Court's indulgence in holding a lengthy colloquy about the Morris ruling were motivated out of an abundance of caution regarding the Morris order. Unless this concern that the questions would elicit evidence forbidden by Morris can somehow be shown as prejudicial to defendant, these assignments are without merit.
Defendant also claims that during cross-examination of one of the expert witnesses, a registered nurse, defense counsel attempted to ask the witness whether she had been instructed to withhold information about the medical history of the victim. The prosecutor objected to the question on the ground that the question called for an answer that would permit introduction of evidence of other offenses. The jury was excused and another long discussion was held between counsel and the bench regarding whether the answers sought by defense counsel would be tantamount to raising a defense of accident, which would in turn open the door to other crimes evidence under this Court's footnote in Morris.
Before the jury was excused the judge cautioned defense counsel about the possibility of opening this door by his questions. Defendant now asserts that these comments constituted impermissible comments on the evidence. As discussed previously, the actions of the trial judge and the prosecutor here were taken to avoid the problem mentioned in Morris. The remarks by the judge to defense counsel did not constitute *1247 comments on the evidence, as these were merely directed to the earlier colloquy with the bench and in no way mentioned the testimony of any witness. Since the objectionable questions on cross-examination threatened to cause a mistrial or otherwise bring before the jury the other crimes evidence held inadmissible in Morris, disallowing such questions was within the Court's clear discretion.
Argument 8: This assignment relates to the previous argument in that it assigns as error the instruction given by the trial judge to the jury following the colloquy noted above.
When the jury returned after the discussion was held regarding the propriety of the defense question, the judge instructed the jury:
"Ladies and gentlemen of the jury: At times there are things that come up during a criminal trial that the jury should not hear, witnesses are sometimes instructed by one side or the other, or by the Court not to make certain statements because it would be things that the jury should not hear. So, I'll ask you to keep that in mind when you hear the witnesses in this case. All right?"
This instruction, to which counsel objected, according to the defense, raised the inference that defense counsel was acting illegally by trying to bring evidence before the jury which it should not hear. On the contrary, the trial judge gave the instruction to rebut the inference raised by defense counsel's question that the prosecutor was attempting to hide certain evidence from the jury. The instruction was given so that the jury would understand why it had been excused from the courtroom. This assignment lacks merit.
Argument 9: According to the defense the trial court erred in qualifying a registered nurse as an expert on child abuse and allowing her to testify that the bruises on the victim indicated such abuse.
The nurse testified that she had worked in the emergency room on emergency room duty during the four years that she had worked at Earl K. Long Hospital. During that time, she testified, she had seen children who were victims of child abuse. She testified within the limits of her knowledge and experience as a nurse and not as a medical doctor that she had observed the physical appearance and external condition of such children. As she explained, she worked under the supervision of a doctor who specialized in child abuse cases, for which she performed nursing assessments. She was submitted as an expert within the limitations of her field and the court ruled that she would be allowed to testify in that respect.
After she was qualified, the nurse testified to what she observed when the child was brought into the hospital. She testified that she saw "multiple bruises on the head, the face, the arms and the chest." When asked to give her opinion about how the bruises had been obtained, she responded that "it looked like the child had been beaten, that was the first thing I thought."
Opinions of persons with special knowledge are admissible as testimony on questions involving knowledge obtained only by such special training or experience. La. Rev.Stat. 15:464. The qualification of a witness as an expert is a question of fact to be determined within the sound discretion of the trial judge; his rulings will not be disturbed in the absence of manifest error. State v. Huckaby, 368 So.2d 1059 (La.1979); State v. Sepulvado, 359 So.2d 137 (La.1978); State v. Gray, 351 So.2d 448 (La.1977); State v. Marks, 337 So.2d 1177 (La.1976).
Practical experience is often sufficient to provide training in a special area of knowledge. In the instant case, the witness testified on cross-examination that she had taken a pediatrics course in nursing school which had covered certain topics such as child abuse. This instruction, when combined with her years of nursing in which she came into contact with patients who were the victims of child abuse, provided her with the special training and knowledge necessary to allow her testimony to include an opinion.
*1248 Two physicians qualified as experts in the area of child abuse also testified that the child was a victim of child abuse. Although defense counsel objected to the qualification of one of these physicians, Dr. Robertson, as an expert, the only objection to the qualification of Dr. Hebert was that the case did not concern child abuse. No objection was made to Dr. Hebert's training or expertise. This Court had held that even if it is assumed that an expert witness was not properly qualified to express an opinion on a particular subject, no prejudice would result from such testimony where another expert witness later testified to the same opinion. State v. Stewart, 357 So.2d 1111, 1115 (La.1978).
Defendant has not shown that this witness lacked the experience and training necessary to qualify her as an expert witness. Since her testimony was properly limited to the extent of her experience and her knowledge as a nurse, the admission of her opinion testimony was not reversible error. This assignment is without merit.
Argument 10: Defendant assigns as error the trial court's allowing the State to introduce into evidence certain X-rays and photographs of the dead child which defendant alleges were "gruesome" and prejudicial.
The X-rays showed that the child had a fractured skull but disclosed no other obvious skeletal fractures. The X-rays were documented during the testimony of Dr. Holden, who performed the autopsy. His testimony was consistent with what the X-rays revealed. The X-rays served to demonstrate his findings and corroborated his testimony.
The photographs show the multiple bruises which the child had sustained. The various colors of the bruises indicate that the bruises were sustained at various times, depending on the range of colors. The injuries as depicted by the photographs were extensively described in detail by Dr. Holden.
The test for the admissibility of allegedly gruesome photographs is "whether their probative value outweighs the possible prejudice that may result from their display to the jury." State v. Myles, 389 So.2d 12 (La.1979); State v. Matthews, 354 So.2d 552 (La.1978); State v. Lewis, 353 So.2d 703 (La.1977). Photographs of the victim have generally been held admissible as relevant to prove the corpus delicti, to corroborate other evidence of the manner in which death occurred, to establish the location, number and severity of the wounds, and to establish the victim's identity. State v. Williams, 353 So.2d 1299 (La.1977).
In Williams, the photographs, which were described as "unpleasant [but] not so gruesome as to overwhelm reason and cause a jury to lose sight of the need for the prosecutor to establish with sufficient independent evidence the guilt of the accused," were held to be admissible. Id., 353 So.2d at 1305. This characterization of the type of photographs admitted in that case is applicable to those introduced in the instant case.
These photographs, taken after the child's death, were made before the autopsy incisions were made. In this respect these photographs were unlike those in State v. Morris, 245 La. 175, 157 So.2d 728 (1963). In Morris this Court found reversible error in admitting into evidence color photographs of a body showing an autopsy in progress. Such photographs would indeed be gruesome and prejudicial. These photographs simply did not fall into this category, as they were not so gory that their probative value was overshadowed.
Additionally, the prosecutor gave special attention to the effect of such photographs upon the jurors during the voir dire examination. He took precautions to ascertain which jurors would be unduly prejudiced or disturbed by the viewing of such photographs in order to assure an impartial verdict. The State's peremptory challenges were used to excuse those jurors who would be so prejudiced.
This assignment is without merit.
Argument 11: The trial court's ruling which allegedly allowed the State's questioning on redirect to exceed the subject *1249 matter of cross-examination is asserted by the defense to be erroneous.
Dr. Holden was called as a State witness and was stipulated to be an expert witness in pediatrics and pathology. On direct examination, he testified to the autopsy findings and to the external injuries of the victim, which included "evidence of old and recent injuries to the head and the rest of the body." On cross-examination he was questioned regarding the possibility that these injuries were caused by an accident, to which he replied in the negative. Defense counsel then inquired whether one or many diseases could have been instrumental in causing the injuries, but again the answer was negative.
On redirect, the physician was again asked about ruling out the possibility of diseases. Then he was asked: "In your uhexperience have youuhseen children, I'm not talking about this child, but have you seen children that have been the victim of beatings or abuse?" Defense counsel objected to this question as going into matters not covered in cross-examination.
Even assuming arguendo that this question did exceed the scope of redirect examination, allowing such questions is "within the trial judge's discretion [and] must be upheld unless an abuse of discretion can be shown." State v. Anthony, 332 So.2d 214, 215-216 (La.1976). Because defense counsel was given an opportunity to recross the witness, at which time the new matter could have been explored, transgressing the general rule regarding the scope of redirect was harmless. La.Rev.Stat. 15:281.
Nevertheless, defense counsel's questions on cross-examination regarding alternative causes of the child's injuries might have opened the door to reinforcement of the doctor's experience and familiarity with child abuse as a cause of such injuries.
This assignment is without merit.
Argument 12: Defendant contends that the trial court erred in allowing a medical expert to testify regarding the cause of the victim's death.
The witness, Dr. Holden, performed the autopsy upon the child after his death. After extensive testimony was given concerning the injuries sustained by the child, the prosecutor asked the doctor whether he had formed an opinion regarding whether the child was the victim of child abuse. The witness responded:
"A: With evidenceuhof old anduh recentuhinjuriesuhto this child. With the documented evidence of the severity of the old and recent injuries, I believeuhwith a fair degree of certainty, that this represents an abused child."
The prosecutor next asked the doctor
"Q: Okay. And, doctor, the injuries that youwe've been talking for a long time about the bruises ... but again, for the record, the blow that was caused to this child that directly caused its death, it's your opinion that this was a forceful blow that would not have been caused by a normal fall from a highchair, such as you saw in the picture or any other uhnormal childhood accident, is that correct, sir?
A: Correct."
Before the doctor expressed his opinion, defendant objected on the grounds that the witness was testifying to something within the province of the jury. The trial judge overruled the objection.
The testimony challenged by defendant is similar to the testimony of the physician in State v. Sneed, 328 So.2d 126 (La.1976). In Sneed, the doctor testified regarding the physical condition in which he found the deceased and expressed his opinion of the cause of death. This Court held that once the doctor was submitted by stipulation as an expert, he was qualified to give an opinion regarding the cause of death. Likewise, in the case at bar, defense counsel accepted Dr. Holden as qualified to be an expert witness. Since experts can properly testify regarding a formulated opinion, defendant's objection was ill-founded. La.Rev.Stat. 15:464-467. The witness had testified at length about the results of the autopsy and his findings. His opinion was therefore *1250 based upon sufficient facts to support his conclusions.
These assignments are without merit.
Argument 13: Defendant objected at trial to the introduction into evidence of a photograph of herself taken at the time of her arrest, just shortly after the child's death.
Defendant complains that the photograph was irrelevant and prejudicial. The State introduced the photograph for the purpose of showing the physical characteristics and the size of the defendant at the time of the child's death. Witnesses had testified that defendant had lost "a lot of weight" at the time of trial. The photograph was introduced by the State, the prosecutor argued, to show that the defendant was a large woman, weighing about fifty or sixty pounds more at the time of the alleged offense than at trial. This size gave her the strength and capability to inflict the forceful injuries to which the medical experts had testified.
Size is indicative of a potential for force. The photograph, in portraying this potential in defendant, was relevant as tending to shed light on this fact. State v. Robertson, 358 So.2d 931 (La.1978). The photograph was of more probative value than prejudicial. State v. Smith, 327 So.2d 355 (La. 1976); State v. Bryant, 351 So.2d 1188 (La. 1977).
At the very worst, the photograph was no more than cumulative evidence, which is generally understood to be additional evidence of the same kind tending to prove the same point as other evidence already given. In strengthening the State's position that the child's injuries were produced by force, the photograph was properly admitted. See, e.g., State v. Phillips, 343 So.2d 1047 (La.1977).
This assignment is without merit.
Argument 14: Defendant asserts that the trial court erred in refusing to give five special jury charges which she requested.
Following the State's final rebuttal closing argument, defense counsel requested that the court give five special charges to the jury. The trial court considered the request but denied the charges on the grounds that three of the charges were covered in the judge's general charge to the jury and the other two were irrelevant.
As defendant did not submit the requested special written charges until after closing arguments, the trial court received these in its discretion. Having submitted them after closing argument, the defense had not absolute right to have them considered. La.Code Crim.Pro. art. 807. Defendant's argument that special extenuating circumstances mandated the acceptance of the charges makes no difference, as the court did accept them and consider their pertinence.
However, special charges numbered 1, 2, and 3 were indeed covered in the judge's general charge concerning circumstantial evidence and direct evidence. Special charges numbers 4 and 5, concerning the definitions of negligent homicide and criminal negligence, were properly held to be irrelevant to the charge for which defendant was tried. Since defendant was charged with second degree murder, and negligent homicide is not a responsive verdict to that charge, no special instruction was required of the definition of this offense. La.Code Crim.Pro. art. 814; State v. Matthews, 380 So.2d 43 (La.1980). The instructions of the trial court were clear that a verdict of guilty could not be returned unless the State had proved beyond a reasonable doubt each and every element of the offense. A special instruction regarding an offense which is not a lesser included offense of second degree murder was not necessary, especially since no defense of accident was raised by defendant.
This assignment is without merit.
The remainder of the assignments lodged by defendant were not briefed or argued on appeal and will therefore be considered abandoned.
For the reasons assigned, the conviction and sentence are affirmed.
*1251 DIXON, Justice (dissenting).
I respectfully dissent.
It turns out that defendant was prosecuted and convicted under a statute not in effect at the time of the offense, and the record is devoid of evidence to support a conviction under the second degree murder statute in effect at the time of the offense.
Further, the treatment of Argument No. 3 would seem to be incorrect.
CALOGERO, Justice, dissenting.
I dissent. Argument No. 5 (Assignments of Error Nos. 10 and 31) has merit. Defendant was convicted under a statute not yet in effect at the time of the offense.
STONE, Justice Ad Hoc (dissenting).
I respectfully dissent.
This court's holding in State v. Payton, 361 So.2d 866 (La.1978) was not applicable to the 1976 legislation in effect at the time of the alleged offense. The amendment of the indictment to charge second degree murder required proof under the statute in effect at the time of the commission of the alleged crime. The required proof is not present in this case.
Defendant's failure to object when the indictment was amended is of no moment under the circumstances here present. The State could have appealed the amendment of the indictment and failed to do so. Jeopardy has now attached and since the conviction cannot be sustained, the case should be reversed and remanded.

ON REHEARING
DENNIS, Justice.
We granted a rehearing to consider the state's failure to introduce any evidence of an essential element of the crime charged. On original hearing we did not reach the question because of our previous decisions holding that the issue must have been raised in a motion for a new trial. E. g., State v. Blackstone, 347 So.2d 193 (La.1977). See the original majority opinion's discussion of defendant's argument number five. Since our original hearing, however, this requirement was abrogated by State v. Peoples, 383 So.2d 1006 (La.1980) in which we held that "it would be patently unfair and a denial of due process to deny a defendant the right to obtain review by this court of a conviction where it is claimed that the state failed to present any evidence of the crime charged or an essential element thereof simply because he did not file a motion for a new trial or filed such a motion and neglected to assert this contention therein." 383 So.2d at 1007.
It is evident from a review of the record that, because of a series of frequent amendments to the first and second degree murder statutes, the trial court and both parties were confused as to which definitions of first and second degree murder were in effect at the time of the charged offense. On the day of trial, over the state's objection, the defendant successfully moved the trial court to order that the indictment be amended to charge her with second degree instead of first degree murder. The state, the defendant and the court commenced trial with the apparent belief that the second degree murder charge required proof of a specific intent homicide. However, the applicable statute defined second degree murder solely as a homicide committed during perpetration or attempted perpetration of a specified felony. Consequently, the state's case was devoid of any evidence of an essential element of the charged offense, i. e., perpetration or attempted perpetration of a felony. Accordingly, defendant's conviction and sentence must be set aside. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); State v. Peoples, supra; State v. Bowen, 376 So.2d 147 (La.1979); State v. Thompson, 366 So.2d 1291 (La.1978); State v. Liggett, 363 So.2d 1184 (La.1978); State v. Searle, 339 So.2d 1194 (La.1976).
Our reversal of the defendant's conviction and sentence raises the question of whether the Double Jeopardy Clause as interpreted by Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978) prevents her retrial. The Burks rule, *1252 broadly speaking, may be said to be that a defendant cannot be retried following an unreversed ruling that the prosecution failed to introduce sufficient evidence to support a conviction. Westen and Drubel, Toward a General Theory of Double Jeopardy, 1978 S.Ct.Rev. 81, 145. However, Burks' rule should not be applied to other cases without consideration of the facts of the case. In Burks the prosecution sought permission to retry the defendant after having had one full, fair and complete opportunity to prove him guilty beyond a reasonable doubt. See Hudson v. Louisiana, ___ U.S. ___, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). In a situation such as the present case, where the state, acting in good faith, was erroneously required by defendant's motion and the trial court's order to amend a proper indictment under which it could have presented evidence of each essential crime element, and where the court and both parties were misled as to the applicable definition of second degree murder, we do not believe the Burks rule prohibits a second trial in which the prosecution will be afforded an opportunity to present its case based on a proper indictment. Unlike the reversal of Burks' conviction, our decision "does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect...." Burks v. United States, supra, 98 S.Ct. 2141, 2147. The Double Jeopardy Clause, according to the Burks court, forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. Burks v. United States, supra, 98 S.Ct. at 2147. In the present case, the prosecution does not seek to supply evidence which it failed to muster; it seeks to present the same evidence under a proper charge. The "failure of proof" in this case was attributable to an erroneous ruling by the trial court, despite the state's objection, that the indictment must be amended, not to the state's failure to muster evidence under the proper indictment upon which it was prepared to proceed.
Accordingly, defendant's conviction is reversed and this case is remanded to the district court for further proceedings consistent with this opinion. The state may not subject the defendant to the prospect of death, however, on retrial. State v. Washington, 380 So.2d 64 (La.1980).
REVERSED AND REMANDED.
LEMMON, J., concurs and assigns reasons.
WATSON, J., concurs for reasons assigned by LEMMON, J.
LEMMON, Justice, concurring.
Defendant was convicted on an erroneous jury instruction, which incorrectly stated the essential elements of second degree murder. The conviction must be set aside, not because of insufficiency of evidence, but because of trial court error in the instruction. Since Burks v. United States, above, only precludes retrial when a conviction is reversed because of insufficiency of evidence, there is no bar to retrial in this case, in which the conviction is reversed because of trial court error in jury instructions. See State v. Williamson, 389 So.2d 1378 (La.1980).
NOTES
[*] Jesse N. Stone participated in this decision as Associate Justice ad hoc.